UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:05CR308-C

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| RONALD McKNIGHT | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on the "Government's Motion For Order Requiring An Administrative *Harper* Hearing" [requesting, in the alternative, a *"Sell* hearing"] filed May 3, 2007 (document #23); and the Defendant's "Motion for Discharge and Response to Government Motion for *Harper* or *Sell* Hearing" filed May 14, 2007 (document #24). The "Government's Response to the the Defendant's Motion . . . and . . . Response . . . " (document #25) was filed June 12, 2007. A hearing on the subject motions was conducted by the undersigned on July 11, 2007.

For the reasons stated herein, the undersigned will <u>deny</u> the Government's motion for an administrative *Harper* hearing, but will <u>grant</u> its alternative motion for a *Sell* hearing (which was held July 11); and will <u>deny</u> without prejudice the Defendant's Motion for Discharge.

### I. <u>FACTUAL AND PROCEDURAL BACKGROUND AND FINDINGS</u>

The Defendant's criminal history and mental illness extends back into his teen years if not before. Regarding the former, Mr. McKnight was convicted of possessing marijuana in 1990 and 1991, and of carrying a concealed weapon (2 counts) in 1990, all before he turned 20-years-old. Thereafter, in addition to driving–related convictions, he was convicted of the following criminal conduct during his 20th year: resisting a public officer (on two different occasions), larceny, unauthorized use of motor vehicle, and most seriously, in this Court, of committing four bank

robberies. The bank robberies were charged in our case numbers 3:93CR237-MU, 3:93CR245-MU, 3:94CR19-MU, and 3:94CR20-MU. Following the Defendant's guilty plea, the Honorable Graham C. Mullen imposed concurrent 57-month terms of imprisonment for each of these bank robberies.

After serving the active portion of his federal sentence, but while still on supervised release, the Defendant committed four more bank robberies. These robberies were charged in our case numbers 98CR39-MU and 98CR92-MU (charging three robberies in a single bill of indictment).

Mr. McKnight's mental condition has been a grave and ongoing concern of this Court since these last four robberies were charged in 1998, resulting in at least five reports of psychiatrists and/or psychologists evaluating the Defendant's competence to stand trial and to assist in his defense. These five evaluations, discussed in more detail infra, were: (1) at the U.S. Penitentiary in Atlanta; primary evaluator: Scott A. Duncan, Psy. D.; report dated September 18, 1998; (2) at FCI Butner in Butner, North Carolina; primary evaluator: Robert G. Lucking, M.D.; report dated February 1, 1999; (3) at FCI Butner, also by Dr. Lucking, report dated June 15, 1999; (4) at the Federal Medical Center, Devens in Ayer, Massachusetts; primary evaluator: Dennis Becotte, Ph.D.; report dated April 1, 2002; and (5) at the U.S. Medical Center For Federal Prisoners in Springfield, Missouri; primary evaluator: Christina A. Pietz, Ph.D.; reports dated March 26, 2007 and March 29, 2007 (an appended Neuropsychology Consultation report).

In the first of the above listed reports, Dr. Duncan concluded that Mr. McKnight was suffering from a mental condition which rendered him unable to understand the proceedings or assist in his defense, although he opined that Mr. McKnight was legally responsible for his conduct at the times of the four bank robberies then in question. Central to Dr. Duncan's conclusion that Mr. McKnight was incompetent to proceed – and central to the same conclusion reached by subsequent

2

evaluators – is Mr. McKnight's psychotic belief that his deceased father lives on inside the right half of his body, including the right side of his brain. Dr. Duncan summarizes Mr. McKnight's interviews on this topic (on page 6 of his report) as follows:

> He reported he talks to his father, and his father's voice comes from inside his head rather than from outside. He stated his father occupies the right half of his body and he occupies the left half. . . . He stated his father has turned into a demon because the things his father tells him are bad. He stated his father has told him to kill people, including three "detention officers" at the Mecklenburg County Jail. . . . The defendant threatened to buy a gun and kill those people when he eventually gets out of prison.

Dr. Duncan also reports that he followed up on Mr. McKnight's threat to kill the detention officers and confirmed with Major Charles Johnson, then the Mecklenburg County Jail Administrator, that two of the three named officers were working at the facility where Mr. McKnight had been housed prior to being transported to Atlanta.

Noting the threats described above, and the fact that Mr. McKnight "has received prison sanctions in the past for Threatening Bodily Harm," Dr. Duncan recommended that "[e]xtra precautions . . . be taken with this defendant in court. He has threatened to be violent on more than one occasion and is delusional" (page 10).

Following the second evaluation, conducted as noted above at FCI Butner, Robert G. Lucking, M.D. likewise concluded that Mr. McKnight was incompetent to proceed. However, he opined that Mr. McKnight would benefit from further treatment, and that he was likely to improve to the extent that he would ultimately be rendered competent to proceed. En route to these conclusions Dr. Lucking noted that Mr. McKnight believes his deceased father has lived in his body since he was 11 or 12 years old (Mr. McKnight's father committed suicide when he was 11-years-old); that Mr. McKnight perceives "that his father is always with him and is constantly giving him

advice and telling him what to do"; and that Mr. McKnight had related in some detail his "homicidal and suicidal plans for some time in the future" (page 3).

Regarding his future plans, Mr. McKnight reported that it was his father who told him to rob a bank (to solve his problem of having no job or money when released from prison); that his father gave him detailed instructions about which banks to rob and how best to do it; and that "he has to kill several guards at the Mecklenburg County Jail" because of what he believes was abusive treatment he received when housed there. In regard to killing the officers, Mr. McKnight reported that his father had said "sacrifices need to be made and some people will die" – a phrase Dr. Lucking reports Mr. McKnight "repeated many times during these interviews" (page 4).

Mr. McKnight's plans for killing the officers were also reportedly the result of perceived instructions from his deceased father. Specifically, his plan was "to shoot them as they are leaving work and then to kill himself by shooting himself in the head" (page 4). As Dr. Lucking reports it, Mr. McKnight further explained:

> He states that it is important that he kill himself to make a statement because if "they" kill him it would make them look like "they got me back." He has not told any of this to his family because his father's voice tells him that he should not do so. He further believes that it is good that he is not with his family so they can learn to get along without him.

Lucking Report dated February 1, 1999, page 4.

Mr. McKnight also told Dr. Lucking during his interviews that he wants to go to trial, not for bank robbery, but "for murder." Specifically, he envisioned an "O.J." like trial in which his attorney would hold a televised press conference "the entire world will see" and in which "Johnny Cockran, Marsha Clark, Judge Ito, Chris Fialko (Mr. McKnight's actual attorney) and Robert Sharpiro" would all participate (pages 4-5). Finally, Mr. McKnight explained to Dr. Lucking that "his sole purpose

4

in going to trial is to let everyone know what is going on in the county jail and to tell them that he is going to kill the correctional officers" (page 8).

As indicated in Dr. Lucking's second report, his hope that further treatment would render Mr. McKnight competent to proceed had not been realized by June 15, 1999 (the date of the second report). However, once again he expressed hope that with further hospitalization and treatment Mr. McKnight "is likely to improve. . . to the extent that he will be able to proceed with the legal process" (page 8 of Report dated June 15, 1999).

Almost two years after Dr. Lucking's second report, Mr. McKnight not having been restored to competency in the opinion of the FCI Butner forensic professionals, he was transferred by Order of the Honorable Malcolm J. Howard dated February 7, 2001 to Federal Medical Center, Devens, in Ayer, Massachusetts, where he remained in treatment for over a year. Thereafter, by letter dated April 2, 2002 (attaching Dr. Becotte's Report dated April 1, 2002), Warden David L. Winn advised the Honorable W. Earl Britt that the treatment team at Devens believed that Mr. McKnight had substantially "recovered from his mental disease or defect." Specifically, the treatment team credited Mr. McKnight's self-report that he had heard no voices and had otherwise been "free of all delusions and psychotic symptoms during sequential appointments since December 2001" (unnumbered pages 2 and 3).

Sometime thereafter, the Defendant was returned to the Western District of North Carolina and was found competent to proceed by the Honorable H. Brent McKnight, who was at that time serving as a Magistrate Judge. After pleading guilty to all four bank robberies, on April 2, 2003 the Honorable Graham C. Mullen sentenced Mr. McKnight to concurrent 87–month terms for each bank robbery, to be served consecutively to the remaining portion of the 57–month sentences which had

been imposed, also by Judge Mullen, in 1994.

Mr. McKnight completed the active portion of the concurrent 87 – month terms (the majority having been served during the years he was being evaluated prior to sentencing), and was again placed on supervised release on May 19, 2005. Approximately three months after he was released Mr. McKnight allegedly committed his ninth (Wachovia Bank, 601 Park Street, Belmont, NC, on August 16, 2005) and tenth (Wachovia Bank, 801 Kenilworth Avenue, Charlotte, NC, on August 17, 2005) bank robberies.

Notes were used to commit the August 16 and 17 robberies, both of which Mr. McKnight has confessed to committing. The first note stated:

"*This is not a Game*

I have a Loaded gun. This is a Robbery

Place all 100's, 50's and 20's on the counter

No Die packs, Don't Touch that Button, You

Have 2 seconds or I will kill you and

Everybody else in Here."

The second note stated:

"This is a Robbery, I have a

Gun place all 100s, 50s, 20s on the counter, or I

will shot you. No Died pack's, don't touch button"

(The investigators ultimately concluded that the Defendant did not actually have a gun during either robbery.)

It is Mr. McKnight's competence to stand trial and to assist in his defense on these last two

6

bank robberies which is currently at issue. Following an evaluation at the U.S. Medical Center For Federal Prisoners in Springfield, Missouri from November 9, 2006 to March 26, 2007, Christina A. Pietz, Ph.D., concluded that Mr. McKnight is not currently competent to proceed but, like her professional predecessors, believes "that if the Court chooses to allow [them] to continue treatment with anti-psychotic medication then there is a substantial probability that Mr. McKnight will be restored to competency" (page 8 of Dr. Pietz "Forensic Report" dated March 26, 2002).

Relevant to the issues at hand, Dr. Pietz' Report also noted that Mr. McKnight "was adamant that he did not suffer from a mental illness and refused to take his medication" (pages 2 and 3); refused to participate in a "competency restoration group" (page 3); that Mr. McKnight's mother reported that "when he returned to live with her, his condition deteriorated, and he would not take his antipsychotic medication" and that she had "attempte[d] to involuntary [sic] commit him for mental health treatment" (page 5); and that in her professional opinion "Mr. McKnight meets the criteria for paranoid schizophrenia" (pages 5-6).

Given the fact that "Mr. McKnight was never taking a therapeutic dose of medication," and in fact was refusing to take medication which was prescribed, Dr. Pietz has requested that the Court conduct a hearing pursuant to <u>Sell v. United States</u>, 539 U.S. 166 (2003). Toward that end Dr. Pietz opines, on pages 7 and 8 of her Forensic Report, that "antipsychotic medication is needed in order for him to be restored to competency and to prevent him from further endangerment to others"; that "Mr. McKnight suffers from schizophrenia and currently presents with significant psychotic symptoms (e.g., paranoia, delusional ideation) that are chronic and which have not remitted spontaneously or with non-medication interventions"; that Mr. McKnight's "psychotic symptoms clearly interfere with his competence to stand trial"; and that "it is well-established in the literature

that the standard treatment for Mr. McKnight's condition, schizophrenia, is anti-psychotic medication," that is, that the proposed forcible administration of anti-psychotic medication to Mr. McKnight is "medically appropriate."

Regarding the medical effects of the proposed treatment, including side effects, Dr. Pietz further reports (at page 8):

> Treatment with anti-psychotic medication, which would need to be administered involuntarily, would likely reduce the intensity of Mr. McKnight's psychotic symptoms and improve his mental status to the level where he would be considered competent to stand trial. The primary treatment of schizophrenia involves anti-psychotic medication, which can produce beneficial clinical effects such as reducing auditory hallucinations, disorganized thought processes, delusional ideation, and any associated bizarre and sometimes dangerous behaviors. The sensitivity of individuals to medication side effects varies widely, with some individuals experiencing minor or no side effects on a medicine that causes significant side effects in another individual. Since 1990, an increasing number of second generation anti-psychotics have become available, which have a more favorable side effect profile for many patients who were previously treated with conventional anti-psychotic medication. These medication side effects are routinely managed by thousands of American psychiatrists in daily clinical practice, who assess the risks and benefits of any particular medication in treating their patients. In my opinion, with the proper prescription and monitoring of anti-psychotic medication, it is substantially likely that Mr. McKnight will be restored to competency and that the proposed treatment would be substantially unlikely to have side effects that would interfere significantly with his ability to assist counsel in conducting a defense.

Upon receipt of Mr. McKnight's most recent evaluation report, the parties filed the above noted motions, that is, the Government has moved the Court to order "an administrative hearing pursuant to Washington v. Harper, 494 U.S. 210 (1990)" or, in the alternative, to conduct a Sell hearing; and the Defendant has moved the Court "to discharge Mr. McKnight pursuant to 18 U.S.C. 4246(e)." Having considered the written and oral arguments of the parties, the Court reaches the following conclusions of law.

## II. CONCLUSIONS OF LAW

In Sell v. United States, 539 U.S. at 180-82, the Supreme Court reversed the Eighth Circuit's approval of forced medication *solely to render a defendant competent to stand trial*. In such a case, *unless also necessary to render a defendant nondangerous*, to justify forced medication, the Government must establish: (1) "that *important* government interests are at stake [such as] the Government's interest in bringing to trial an individual accused of a serious crime;" (2) "that involuntary medication will *significantly further* those . . . interests," that is, "that administration of the drugs is substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair;" (3) "that involuntary medication is *necessary* to further those interests," that is, "that any alternative, less intrusive treatments are unlikely to achieve substantially the same results;" and (4) "that administration of the drugs is *medically appropriate*, *i.e.* in the patient's best interest in light of his medical condition." Id. at 180-82 (emphasis in original).

Inasmuch as Dr. Pietz' Forensic Report addresses each of these elements (and her evaluation as well as previous evaluations discussed in the preceding section support her conclusions), the Court finds that the four elements required by Sell have been established, and that it is unnecessary to take live testimony or allow cross–examination of the medical professionals who have evaluated the Defendant during the past eight years to reach this conclusion. Specifically, the Court finds: (1) that important government interests are at stake in trying Mr. McKnight, who has been convicted in the past of committing eight bank robberies, on the charges that he committed two additional bank robberies shortly after his release from custody in 2005; (2) that involuntary medication will

significantly further those interests by likely restoring Mr. McKnight's competency to stand trial and assist in his defense, and that any side effects of the medication are substantially unlikely to interfere with Mr. McKnight's ability to participate in his defense; (3) that forcible medication is necessary, that is, that less intrusive means (which have already been attempted unsuccessfully) are unlikely to achieve substantially the same results; and (4) that forcible administration of antipsychotic medication to Mr. McKnight at this time is medically appropriate.

As for the Government's request that the Court order an administrative hearing pursuant to Washington v. Harper, the Court fails to see the value in such a hearing. This case has been indicted for two years and, inasmuch as the Sell elements have been established and the Washington v. Harper criteria are much narrower (allowing forcible medication only if an incarcerated defendant is a danger to himself or others), the Court concludes that the more efficient approach is to order the alternative relief requested by the Government.

As for the Defendant's motion to be discharged pursuant to 18 U.S.C. § 4246(e), the Court finds no merit in this request at this time. Indeed, either the Defendant will be restored to competency and tried, or a hearing will be conducted pursuant to 18 U.S.C. §§ 4241(d) and 4246 to determine whether the Defendant presents a danger to himself or others (depending on the outcome, either requiring or precluding his release). Furthermore, the defense counsel's argument to the contrary, there is much evidence in this record which would support a finding that Mr. McKnight, if released, *would* present a danger to himself *and* others.

There is, however, one element lacking in the Government's showing which is required to justify forcible medication: namely, identification of "the particular medication*, including the dose range*, [medical professionals] propose to administer to [the defendant] to restore competency."

10

United States v. Evans, 404 F.3d 227, 241 (4th Cir. 2005)(emphasis added). Once the medication and dosage are determined the Government must also submit to the Court for approval – before beginning forcible medication – (1) what effects this particular medication is likely to have on Mr. McKnight as an individual; (2) whether this particular antipsychotic medication is substantially likely to restore Mr. McKnight to competency; (3) the basis for concluding that this particular medication and dosage is "medically appropriate"; and (4) considering the likely effects on Mr. McKnight, whether and why medical professionals have concluded that the probable benefits of the proposed treatment outweigh any negative side-effects. See Evans, 404 F.3d at 240-42.

### III. ORDER

**NOW THEREFORE, IT IS ORDERED:**

1. "The Government's Motion For Order Requiring An Administrative *Harper* Hearing" filed May 3, 2007 (document #23) is **DENIED IN PART** and **GRANTED IN PART**, that is that the Court will not order that an administrative *Harper* hearing be conducted, but will permit and order forcible medication pursuant to Sells and Evans, subject to the Court's approval of the additional showing set forth in the preceding section.

2. The Defendant's "Motion for Discharge . . ." filed May 14, 2007 (document #24) is **DENIED**; provided, however, should forcible medication not ultimately be authorized or if the Defendant is not restored to competency (whether or not forcible medication is permitted), defense counsel is free to renew his motion for discharge at that time.

3. The Defendant is hereby committed to the care and custody of the Attorney General of the United States to be transported to an appropriate federal medical facility for further treatment and evaluation as set forth herein. Said commitment shall initially be for a period of four months

(beginning once the Court approves forcible medication, if at all, as set forth above), which period may be extended upon a showing that further treatment is medically appropriate and is substantially likely to restore the Defendant to competency.

4. The undersigned recommends that the Defendant be transported to one of the facilities where he was most recently treated and evaluated, that is, either to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri or to FCI Butner. **Provided, however, given the greater confidence the Defendant expressed in Dr. Lucking (of FCI Butner) at the July 11, 2007 hearing, the undersigned recommends that Mr. McKnight be transferred to that facility for the subject evaluation and treatment.**

5. Forcible medication of the Defendant shall not commence, if at all, until this Court receives the additional information described in the preceding section and specifically approves the Government's showing as complying with the requirements of United States v. Evans, 404 F.3d at 240-42.

6. The Clerk is directed to send copies of this Memorandum And Opinion And Order to Assistant U.S. Attorney Steven R. Kaufman; defense counsel Christopher C. Fialko; the U.S. Marshal; and to the Honorable Robert J. Conrad, Jr..

**SO ORDERED.**

Signed: July 12, 2007

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge